UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                    Movant,

v.

JONATHAN AGBEBIYI,

                    Respondent.

_____/

Criminal Case No. 11-20076
Civil Case No. 15-13523

SENIOR UNITED STATES DISTRICT
JUDGE ARTHUR J. TARNOW

### ORDER DENYING MOTION UNDER 28 U.S.C. §2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE [368]

On October 7, 2015, Movant, through an attorney, filed a Motion under 28 U.S.C. §2255 to Vacate, Set Aside, or Correct Sentence. [368]. The Government responded on December 1, 2015 [372], and Movant, through an attorney, filed a notice of supplemental authority on August 30, 2016 [378]. For the reasons stated below, Movant's Motion to Vacate [368] is **DENIED** and Movant is denied a certificate of appealability.

### PROCEDURAL BACKGROUND

On February 17, 2011, Movant was indicted, alongside ten other individuals, for conspiracy to commit healthcare fraud. [3 at Pg ID 7-17]. Movant then filed a notice of appeal on November 28, 2012. He raised three issues: (1) that the District Court committed plain error by failing to specifically determine the amount of loss attributable to Movant from his time participating in

the conspiracy; (2) that his sentence violated the Sixth Amendment, because the amount of loss used in determining the Guidelines based offense level enhancement, and the amount of restitution was not determined by the jury; and (3) that he was entitled to a judgment of acquittal on the conspiracy charge. A panel of the Sixth Circuit Court of Appeals rejected his arguments and affirmed his sentence in an Opinion issued on August 8, 2014.

## FACTUAL BACKGROUND

On appeal from Movant's conviction, the Sixth Circuit summarized the background of this case, in pertinent part, as follows:

> In 2007, Karina Hernandez moved from Miami, Florida, to the Detroit, Michigan, area. Hernandez, who had a high-school education, planned to open a clinic for the purpose of providing diagnostic testing which could be billed to Medicare. Hernandez admitted that she opened the clinic for the purpose of defrauding Medicare. Marieva Briceno (Hernandez's mother), Juan Villa (Hernandez's brother-in-law), Dora Binimelis and Emilio Haver were also involved in this scheme.
>
> Hernandez first opened Blessed Medical Clinic ("Blessed"), in Livonia, Michigan, with the assistance of her mother and Dora Binimelis. Hernandez later opened the Alpha & Omega Medical Clinic ("Alpha & Omega") and the Manuel Medical Clinic ("Manuel")…All three clinics were located in the same building and shared equipment…
>
> In order to bill Medicare, the clinics were required to employ doctors to work at the clinics. The clinics provided the doctors with forms to order diagnostic tests, such as EKGs and nerve conduction tests…
>
> Doctor Agbebiyi, who specialized as a gynecologist, obstetrician and general family doctor, worked for the clinics from April, 2008, through January 15, 2010. Hernandez interviewed Agbebiyi for the position and gave him a tour of the clinic to show him the diagnostic equipment. Hernandez explained to

Agbebiyi that after he had seen a patient, the patient would be referred for diagnostic tests. According to the Government, Agbebiyi ordered numerous diagnostic tests without any legitimate medical purpose so that the clinic could generate profits from Medicare reimbursement revenues. Agbebiyi worked for the clinics on a part-time basis from April of 2008 to January of 2010, and was paid $100 per hour. After Hernandez opened Manuel, Agbebiyi agreed to work there for his hourly rate plus fifteen percent of the total amount being billed by the three clinics.

The clinics employed drivers who were paid to find patients who were Medicare-eligible and bring them to the clinics. The goal was to make money for the clinics when the clinics' doctor referred patients for diagnostic tests. The drivers were organized by Hernandez's husband, Santiago Villa. Isaac Carr, one of the drivers used by the clinics, testified that he would go to soup kitchens and recruit persons who had a Medicare card to go to the clinics for cash. Carr was paid $50 for every patient he brought to the clinic, and the patient was also paid $50…Agbebiyi knew that the clinics paid a driver to bring in patients.

The patients were coached to say they had certain symptoms, such as lower back pain, headaches, or swollen knees…Dr. Agbebiyi billed Medicare for eighteen nerve conduction studies administered to Madden. No one from the clinic ever called Madden to talk to her about the results of these tests.

Ultrasound tests were performed at the clinics by Kim Seung Hee, a certified ultrasound technician who worked at the clinics for seven to eight months until June, 2009. Hee testified that some patients stated they came to the clinic for prescriptions, and objected or threatened her when she started to perform the ultrasound tests ordered by Agbebiyi. On those occasions, Agbebiyi instructed her to go ahead and do the tests. Occasionally when she informed Agbebiyi that a patient had received ultrasound tests within the past two or three months for which no results had been received, Agbebiyi instructed her to go ahead and perform the test anyway. Hee observed diagnostic tests being performed at the clinic even when no doctor was present. Hernandez and Juan Villa forced her to perform ultrasounds even when Agbebiyi was not there. When Hee informed Agbebiyi about this, he would look at the chart, see the patient, and tell her to do the ultrasound…

After seeing a patient, Agbebiyi would tell Oliver which tests were ordered for the patient, and would give her the patient's prescriptions. The

prescriptions were given to her rather than to the patients because the patients would leave before taking the tests if the prescriptions were given to them directly. Many patients also complained to Agbebiyi about having to take the tests. They received their prescriptions for drugs such as Vicodin, Metformin, and Xanax after taking the tests.

At trial, the government presented the testimony of Dr. James Teener, M.D., a neurologist with board certifications in neuromuscular and electrodiagnostic medicine. Dr. Teener explained that a nerve conduction test involves placing electrodes on the skin at the location of specific muscles under study. The electrodes are connected to a computer. The nerve is stimulated with an electrical impulse, and the result of exciting the nerve is recorded. The study is designed by the physician, although the test can be performed by a technologist. The technologist must complete six months of observational training and another three to four months of work with intense supervision before being permitted to give the test independently. Usually obstetricians are not trained in nerve conduction studies. Teener's usual practice is to remain in or near the room to observe the administration of the test and to explain the results to the patient.

Teener testified that, as a nerve specialist, he orders a nerve conduction study for one-half to two-thirds of his patients, but that it is very uncommon to administer a nerve conduction study repeatedly to the same patient. He examined nerve conduction test results in fifteen to twenty patient files from the clinics, and found that none of the tests were done properly. Nerve conduction studies are almost always done in conjunction with a needle electromyography test, which is typically done at the same visit as the nerve conduction test and involves the discomfort of inserting a needle into the muscle. The needle examination was not done in any of the patient files he reviewed.

Teener also testified that the transcranial Doppler test, an ultrasound test used to evaluate the velocity of blood flow within the brain, is infrequently administered because the test is inaccurate and CAT scans and MRIs give a picture of what the blood vessels look like. The transcranial Doppler test would not be an appropriate test for someone complaining of a headache.

 Medicare was billed for 537 patients under Agbebiyi's provider number for services dating from April 29, 2008, through January 29, 2010. Ninety-three percent of Agbebiyi's patients (499 patients) received surface nerve

conduction tests. Medicare was billed $2,265,665 for *629 these tests, and Medicare reimbursed the clinics for $1,125,634. Claims were submitted to Medicare for sixty-nine percent of Agbebiyi's patients (372 patients) for transcranial Doppler tests in the amount of $178,702, and Medicare reimbursed those claims in the amount of $88,171. Only one patient out of the 537 patients seen by Agbebiyi did not receive either the nerve conduction or transcranial Doppler test. Medicare was also billed under Agbebiyi's provider number for H–Reflex studies in the amount of $97,650, and Medicare reimbursed these claims in the amount of $38,686. The claims submitted for these three tests totaled $2,542,017, and Medicare reimbursed the clinics for the three tests in the amount of $1,252,491.

These three tests were just a fraction of the types of tests ordered by Agbebiyi. For example, the record indicates that from July 1, 2008, through November 23, 2009, Blessed and Manuel billed Medicare $14,540.24 under Agbebiyi's provider number for office visits and tests which included venipuncture, electrocardiogram, nystagmus tests, a caloric vestibular test, and oscillating tracking test, a sinusoidal rotational test, and an electro-oculography test.

In April of 2008, Agbebiyi received his first payment from the clinics, made payable in his name. From May, 2008, through January, 2010, the payments were made by the clinics to Harmony International. Agbebiyi is the agent for Harmony Health Choice, and he worked at the Harmony International Clinic. In his individual capacity and in his capacity with Harmony International, Agbebiyi was paid a total of $183,476.69 by the clinics from April, 2008, through January, 2010. A chart showing a combination of the payments to Agbebiyi and Harmony International from bank records along with the payments by Medicare to the three clinics showed that Medicare paid $1,258,277.18 to Blessed, $1,043,948.64 to Alpha & Omega, and $679,803.37 to Manuel, resulting in a total of $2,982,029.19.

On May 11, 2012, the jury returned a verdict of guilty on Counts 1 through 5 and Count 7, and Count 6 was dismissed upon the government's motion.

A sentencing hearing was held on November 6, 2012. In the presentence investigation report ("PSR"), the probation officer concluded that Agbebiyi joined the conspiracy in April, 2008, and was employed by the clinics for approximately eighteen months. In calculating the base offense level under the advisory United States Sentencing Guidelines ("the Guidelines") the

probation officer determined that the amount of actual loss was
$2,982,029.19, stating that this was the amount paid to the three clinics "as a
result of the fraudulent claims attributed to the defendant." PSR ¶¶ 26–27.
The probation officer's calculations resulted in a total offense level 28,
Criminal History Category I, with a sentencing range of 78 to 97 months.
Defense counsel agreed with the probation officer's calculation of the
applicable range. After addressing the sentencing factors contained in 18
U.S.C. § 3553(a), the district court deviated downward from the range
established under the Guidelines, and imposed a sentence of sixty months
incarceration on each count to be served concurrently. The district court also
ordered the payment of restitution in the amount of $2,982,029.19, as a joint
and several obligation with Agbebiyi's co-conspirators. The judgment filed
on November 14, 2012, also directed the forfeiture of $183,476.69 from
Agbebiyi, representing the amount of unlawful proceeds which he
personally profited from the fraud.

*United States v. Agbebiyi*, 575 F. App'x 624, 629-30 (6th Cir. 2014).

## ANALYSIS

To succeed on a motion to vacate, set aside, or correct a sentence, a movant

must allege "(1) an error of constitutional magnitude; (2) a sentence imposed

outside the statutory limits; or (3) an error of fact or law that was so fundamental

as to render the entire proceeding invalid." *Pough v. United States*, 442 F.3d 959,

964 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th

Cir. 2003)).

Movant challenges his sentence here on four grounds and requests relief

from judgment and commitment. Movant claims that: (1) trial counsel was

ineffective for failing to object to the jury instruction on "deliberate ignorance;" (2)

trial counsel was ineffective for advising Movant not to testify at trial; (3) trial

counsel was ineffective for failing to file a sentencing memorandum to explain how Movant's sentence should be tailored to his age and health; and (4) the Government committed a *Brady* violation by failing to produce over 500 potentially exculpatory patient records.

The Government disputes all of these claims, both on the merits and based upon procedural default for the *Brady* claim and the ineffective assistance of counsel claims, because they are presented as claims on the merits and do not meet the standard for demonstrating ineffective assistance of counsel.

A Movant will be procedurally barred from asserting claims in a § 2255 motion that could have been raised on direct appeal, but were not brought, unless the Movant can show both good cause for failing to raise the claim on direct appeal and that he would suffer actual prejudice if the claims were not heard. *Massaro v. United States*, 538 U.S. 500, 504 (2003). However, ineffective assistance of counsel claims are exempted from the general rule barring a court from considering, on a motion to vacate sentence under 28 U.S.C.§ 2255, arguments not raised on direct appeal. *Id.* The Court will consider the merits of Movant's claims in this Motion, despite the Government's argument that the claims have been procedurally defaulted.

### 1. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

To establish ineffective assistance of counsel, a movant must demonstrate that defense counsel rendered deficient performance and thereby prejudiced the movant's defense, so as to render the outcome of the proceedings unreliable. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "Counsel's failure to object to an error at sentencing or failure to raise a viable argument that would reduce his client's sentence may constitute deficient performance." *McPhearson v. United States*, 675 F.3d 553, 559 (6th Cir. 2012) (citing *United States v. Thomas*, 38 Fed. Appx. 198, 203 (6th Cir. Mar. 15, 2002)). However, a court owes "substantial deference to counsel's decisions not to raise an argument, even a meritorious argument, if the decision might be considered sound trial strategy." *Id.* (quoting *Hodge v. Hurley*, 426 F.3d 368, 385 (6th Cir. 2005)) (internal quotation marks omitted). Therefore, counsel's omission of an argument for a lighter sentence constitutes deficient performance only if the omission was objectively unreasonable. *See id.* If a movant establishes that counsel's performance was in fact deficient, he need not prove that an effective counsel likely would have changed the outcome; he need only show a probability of a different outcome sufficient to undermine confidence in the results of the proceedings. *See Nix v. Whiteside*, 475 U.S. 157, 175 (1986) (citing *Strickland*, 466 U.S. at 694).

### a. FAILURE TO OBJECT TO "DELIBERATE IGNORANCE" JURY INSTRUCTION CLAIM

Movant contends that his trial counsel was ineffective for failing to object to the jury instruction of "deliberate blindness" since the state of mind required to be convicted of a conspiracy is that the "Defendant knowingly and voluntarily joined the conspiracy." [368 at Pg ID 3044-3045]. Specifically, the jury was instructed, regarding Movant's state of mind, that:

> No one can avoid responsibility for a crime by deliberating ignoring the obvious. If you are convinced that the Defendant deliberately ignored a high probability that Blessed Medical Clinic, Alpha & Omega Medical Clinic and Manuel Medical Clinic were billing for medically unnecessary tests, you may find that the Defendant knew Blessed Medical Clinic, Alpha & Omega Medical Clinic and Manuel Medical Clinic were billing for medically unnecessary services. But to find this, you must be convinced beyond a reasonable doubt that the Defendant was aware of the high probability that Blessed Medical Clinic, Alpha & Omega Medical Clinic and Manuel Medical Clinic were billing for medically unnecessary tests, and that the Defendant deliberately closed his eyes to what was obvious. Carelessness or negligence or foolishness on his part is not the same as knowledge and is not enough to convict. This, of course, is all for you to decide.

[299, Pg ID 1800]. Further, Movant contends that this instruction should not have been given because the Government failed to show that Movant knew enough about the daily operations of the conspiracy to be aware of the illegal activity and deliberately ignore it. [368 at Pg ID 3046].

First, Movant is incorrect that the deliberate ignorance instruction was clearly erroneous and lowers the mental state required for conspiracy. This deliberate ignorance instruction follows the Sixth Circuit Pattern Criminal Jury

Instruction §2.09, and repeatedly has been upheld as a valid instruction in conspiracy cases in the Sixth Circuit. *See e.g. United States v. Williams*, 612 F.3d 500, 507–08 (6th Cir. 2010); *United States v. Myint*, 455 F. App'x 596, 604 (6th Cir. 2012).

As the Court in *United States v. Williams* explained, this instruction is appropriate because the "deliberate-ignorance instruction was provided well before the Court's instruction about the elements of a criminal conspiracy" and the Sixth Circuit has previously held that this instruction is permissible to show a conspirator's knowledge of the unlawful aims of a conspiracy. 612 F.3d 500, 507–08 (6th Cir. 2010). Similar to in *Williams*, the deliberate ignorance instruction was delivered before the conspiracy instructions, which, in a separate portion of the instructions, clearly states that the Government must prove that Movant "knowingly and voluntarily joined the conspiracy." [299, Pg ID 1800, 1802]. Therefore the instruction is valid under Sixth Circuit precedent.

Movant also has failed to demonstrate that, even if trial counsel was constitutionally deficient, the outcome would have been different if he had objected to the instruction, or even if the instruction had not been given. Because of the extensive evidence produced at trial by testimony from Teener and various non-physician staff, Movant does not attempt to show that the outcome of the trial would have been different, beyond conclusory statements that there was no direct

evidence that he had direct knowledge of any wrongdoing, and fails to establish that a different outcome would have occurred if the instruction had been objected to or not given.

Finally, even if, as claimed by Movant, the deliberate ignorance instruction was not supported by sufficient evidence, it would be harmless error as a matter of law because, since the instruction does not misstate the law, as explained above, "even if we assume that there was insufficient evidence to justify giving the instruction, the jury, in following the instruction, must *not* have convicted the defendant on the basis of deliberate ignorance." *United States v. Mari*, 47 F.3d 782, 785 (6th Cir. 1995). Therefore, Movant cannot show that there is any prejudice under *Strickland* and this is not a valid ground to vacate the sentence.

### b.  FAILURE TO ADVISE MOVANT TO TESTIFY CLAIM

Movant claims that his trial counsel was ineffective for failing to advise him to testify, and by abandoning a previous strategy that called for Movant's testimony. Movant attests that he would not have accepted his advice had he known that a deliberate ignorance instruction would be given.

During his trial, Movant stated to the Court that he knew he had a right to testify, had made a decision not to testify, that his silence could not be used against him, and that he was not forced by anyone to give up the right to testify. [299 at Pg ID 1717]. While Movant asserts in his Motion that he would have given testimony,

including, *inter alia*, that "he never intended to support or conspire to commit fraudulent practices" and that "he provided good medical care to his patients and only ordered medically necessary tests," he does not provide specific details about the content of his testimony had it been delivered and how it would have impacted the outcome of the jury's decision, given the other evidence presented at trial. Thus, he affirmatively cannot prove prejudice by only stating speculative testimony and opinions of how this would have impacted the jury's decision. *Hodge v. Haeberlin*, 579 F.3d 627, 640 (6th Cir. 2009).

Additionally, Movant does not address the valid trial strategy that this decision served, given the Government's trial brief filed prior to the trial. In this document, the Government informed defense about its intent to introduce evidence, pursuant to Rules 405(b) and 405, that illustrated instances of Movant's poor medical judgment, including that he was previously censured for, *inter alia*, poor medical judgment, taking fees for medical services he did not render, and ordering "Vitamin B-12 injections for a patient whose medical records lacked any 'clinical evidence' or laboratory tests to 'support the use of Vitamin B-12,'" ultimately leading to his license to practice being revoked in 1994. [249 at Pg ID 1354-1358]. The Government warned that, if Defendant took the stand and testified that, "in his medical judgment, the neurological tests he ordered were medically necessary," this evidence would be used to impeach him under Rule

608(b). Considering the information at hand, it cannot be demonstrated that counsel was inadequate by advising Movant not to testify, regardless of the jury instructions, and therefore this claim must fail.

### c. SENTENCING MEMO CLAIM

Movant claims that his trial counsel was ineffective for failing to file a sentencing memorandum, specifically arguing that the absence of a memorandum that disclosed his health condition was particularly prejudicial because this meant that the Court did not adequately take into consideration his age and health at sentencing. [368 at Pg ID 3051].

During sentencing, Movant testified that he had read the Presentence Report, which stated that Movant had "self-diagnosed" himself with degenerative disc disease, and that he had discussed this report with his attorney and was satisfied with its contents. PSR §52; [328 at Pg ID 2645]. Before allocution, defense counsel informed the Court that Movant was having back pains, and requested that he be permitted to sit down during the proceedings. [328 at Pg ID 2643].

Movant acknowledges that the Court "greatly weighted [his] health and age when determining his sentence." [368 at Pg ID 3052]. Specifically, the Court considered Movant's age, 63, and health, observing that:

> And your health is—you might be a little precocious [sic] in terms of age appropriate. Your back's wearing and your hip, other things that people in the '60's sometimes have. But that's a factor.

> But there's no way that I would vary down to probation. I am going to vary a little bit, mostly based on your health and age…

[328 at Pg ID 2662]. Based on this assessment, the Court considered the advisory sentence of 78-97 months' imprisonment, and rendered a sentence of 60 months.

Movant argues that he was prejudiced because the Court only considered the aspects of Movant's health that were observable, but offers no evidence of what other health-related information would have been supplied in a sentencing memorandum that would have led to a substantial likelihood of a lower sentence. Rather, Movant makes conclusory statements that the lack of a sentencing memorandum that described his health and age prejudiced the outcome of the proceeding, and prevented the Court from even considering probation. Therefore, Movant has not established prejudice under *Strickland,* and this ground for ineffective assistance of counsel must fail.

## 2.  BRADY CLAIM

Movant further claims that the Government committed a *Brady* violation when it failed to produce the entirety of the medical records that contained potentially exculpatory evidence. There is no dispute that any possible *Brady* claims have been procedurally defaulted by Movant, but the Court will examine the merit of the claim in this Order.

To establish a *Brady* claim, Movant must show that the Government suppressed evidence, that this evidence was favorable to the defense, and that the

suppressed evidence was material. *United States v. Graham*, 484 F.3d 413, 417 (6th Cir. 2007), citing *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir.2000). To be material under *Brady*, it must present a "'reasonable probability' that the outcome of the trial would have been different if the evidence had been disclosed." *Pudelski v. Wilson*, 576 F.3d 595, 614 (6th Cir. 2009). There must be more than pure speculation on hypothetical uses of a report in order to establish materiality. *Id* at 614-15.

Before Movant's trial, the Government filed a subpoena on Marieva Briceno, a non-cooperating defendant who had previously pled guilty to the same health care fraud conspiracy that Movant was charged with. This subpoena requested, *inter alia*, business records pertaining to the clinics, and medical records concerning nineteen different patients treated at three different medical clinics that were operated by Briceno, and at which Movant worked as a physician. [232-1]. Briceno moved to quash the subpoena. [232].[1] In response, the Government explained that they were willing to "narrow its request for information to a mere 19 patients." [235 at Pg ID 1124]. Movant did not file any objection to this response.

The Government eventually obtained approximately 20 patient files from storage in Florida as requested. At the trial, FBI Special Agent Alfred Burney testified that the 20 files requested and obtained were "the medical records for the

---

[1] This Motion to Quash was eventually withdrawn by Briceno. [328].

top 20 beneficiaries that were billed by those three clinics and also the medical

records…of the beneficiaries that we interviewed during the process of the

investigation." [299 at Pg ID 1721]. On cross examination, Special Agent Burney

was further questioned on these 20 files. Defense counsel questioned:

> Q: You hand-selected 30 files?
>
> A. The top 20 beneficiaries billed.
>
> Q. This wasn't a statistical sample of the number of files. You just hand-picked 20 files. Is that a fair question?
>
> A. The statistical reference was the top 20.
>
> Q. How is that statistical as to whether the services provided were a proper service?
>
> A. We didn't pick specifically Dr. Agbebiyi's file. We took the top 20.

[299 at Pg ID 1734].

Movant contends that he requested the remainder of the files be turned over,

and that the prosecution and FBI investigators allegedly "claimed to have no

knowledge of their whereabouts," constituting "at least an inadvertent suppression

or information, if not willful," because the Government had at its disposal the

means to obtain all the files. [368 at Pg ID 3054]. Further, Movant claims that, in

this case, the "prosecution was aware that the FBI hand-picked only those files that

would favor the prosecution" and that this violated *Brady*. Movant also states that

"[t]he fact that so many missing files were never obtained by the Defense creates a

reasonable probability that those files would have produced a different verdict."
[368 at Pg ID 3054].

First, Movant has not provided any evidence that he ever requested these documents, or that the prosecutors and FBI told him that they did not have any knowledge of their location. Movant merely offers a conclusory statement that is absent of any proof supporting the allegation. Additionally, Movant does not provide any evidence that the FBI intentionally "hand-picked files that would favor the prosecution," as alleged in the Motion. In fact, per testimony offered at trial on direct and cross, the files were not hand-picked, but were instead retrieved based on previous interviews during the investigation and on a statistical sampling of the top beneficiaries. Indeed, Movant was not targeted specifically in the 20 files requested. Movant offers no evidence to refute or bring into question the veracity of this sworn statement.

Finally, Movant has filed to provide any evidence that the contents of these other files would have been material, or that it was reasonably probable to result in a different outcome. *Pudelski*, 576 F.3d at 614-15. In fact, the files of the 20 patients provided such damning evidence against Movant that defense counsel fought, successfully, to prevent the Government's attempts to introduce them into evidence. Given the opinion evidence of Teener and other non-physician staff concerning these files, there is nothing on the record to support Movant's bare-

bones conclusory statement that the remaining files would have produced a different verdict, or that their absence "eviscerated" Movant's defense. [368 at Pg ID 3055]. Therefore, Movant has not proven that this *Brady* violation claim should successfully vacate Movant's sentence.

Accordingly,

**IT IS ORDERED** that Movant's Motion to Vacate [368] is **DENIED** and Movant is denied a certificate of appealability.

**SO ORDERED**.

s/Arthur J. Tarnow
Arthur J. Tarnow
Dated: December 14, 2016          Senior United States District Judge